FILED
2026 Sep-08 PM 01:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:24-cv-325-CLS** |
| | ) | |
| **AI SIGNAL RESEARCH, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Steven Parker worked as a mechanical designer for defendant, AI Signal Research, Inc., for more than eight years, from January 14, 2014,[1] until August 30, 2022, when he was terminated. He subsequently filed this suit, asserting claims of age discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff abandoned his age discrimination claim when responding to defendant's motion for summary judgment.[2] Consequently, the following opinion addresses only plaintiff's contention that he was discharged in retaliation for statutorily-protected expression. Specifically, the

[1] *See* doc. no. 1 (Complaint), ¶¶ 8-9 (plaintiff originally "was hired as a temporary employee" for defendant "through Techni-Core Professionals, Inc." on October 11, 2011, but "became a direct hire" on January 14, 2014).

[2] *See* doc. no. 63 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 2 n.1 (stating that plaintiff "does not pursue" his age discrimination claim). *See also* doc. no. 59 (Defendant's Revised Motion for Summary Judgment & Supporting Brief), at 2 (correctly contending that plaintiff "cannot establish a *prima facie* case of [age] discrimination because he was not replaced by or treated less favorably than a substantially younger employee").

complaint alleges that:

> 87. Plaintiff engaged in protected activity.
>
> 88. Parker complained [in mid-2020[3]] to Andy Meager [*sic*[4]] that his SolidWorks license had been seized and given to a younger employee under 40.
>
> 89. In 2020 and in August 2022, Parker complained that younger employees were treated more favorably than employees over 40.[5]
>
> 90. On August 30, 2022, Parker was terminated from ASRI.

Doc. no. 1 (Complaint), at 13-14 (alterations and footnotes supplied).

## I. FACTUAL BACKGROUND

AI Signal Research, Inc. ("ASRI") is based in Huntsville, Alabama, and provides engineering, test and evaluation, and technical services to aerospace and defense customers of the United States Department of Defense, including the Army, the Air Force Research Laboratory, Federal Aviation Administration, and NASA. The company "specializes in signal analysis, range support and software development, particularly for rocket engine testing."[6] Many of its employees,

---

[3] As discussed *infra*, in the text accompanying note 35, plaintiff was transferred from defendant's Environmental Component Logistics department to its Environmental Component Analytics department on May 23, 2020, and this complaint occurred following that transfer.

[4] The surname of this person is correctly spelled "Meagher," and he was the Program Manager of defendant's Environmental Component Analytics department.

[5] *See also* doc. no. 1 (Complaint), ¶ 71 ("In early August of 2022, Parker complained that younger and less experienced workers were being treated more favorably than older workers.").

[6] Doc. no. 53-1 (Quick decl.), ¶ 4.

including plaintiff, worked at a facility located on the United States Army's Redstone Arsenal in Huntsville, Alabama, known as "Building 4500."[7] The Army is in charge of all persons who work anywhere on Redstone Arsenal.[8]

## A. ASRI's Employment Policies

ASRI's "Equal Employment Opportunity Program" is described in the company's employee handbook. It prohibits discrimination based upon an employee's age,[9] among other protected characteristics, and states that:

> If an employee believes [he or she has] encountered discrimination [based upon, among other characteristics, his or her age by] a Supervisor, coworker, customer, supplier, vendor, or visitor, [the employee] shall advise [his or her] immediate Supervisor, Program Manager, or [the company's] Human Resources department. An immediate and thorough investigation into the allegations shall take place.
>
> *An employee's status shall not be adversely affected by bringing a claim of discrimination to management's attention.*

Doc. no. 54 (ASRI Employee Handbook), ¶ 10.2, at ECF 1-2 (alterations and emphasis supplied).

---

[7] *Id.*, ¶¶ 5-6.

[8] Doc. no. 1 (Complaint), ¶¶ 10-11.

[9] Doc. no. 54 (ASRI Employee Handbook), at ECF 1. **NOTE**: "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing"). *The Bluebook: A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010). When this court cites to pagination generated by the header electronically imprinted on a scanned copy of a document filed in this case, it will, as here, precede the page number(s) with the letters "ECF."

In addition to the assurance contained in the second paragraph quoted above, the employee handbook also contains the following policy statement, specifically prohibiting retaliation:

> Retaliation against an individual for reporting any violation of this policy or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, shall be subject to disciplinary action. Acts of retaliation shall be reported immediately to [the employee's] Manager or Human Resource Manager or follow the [reporting procedure outlined elsewhere in the handbook].

*Id.*, ¶ 10.12, at ECF 5 (alterations supplied).

ASRI's 2022 employee handbook provided lists of conduct that could subject an employee to either disciplinary action,[10] or immediate termination of employment.[11] The first infraction named in the list of offenses that might subject an employee to immediate dismissal was that of "Insubordination *or refusal to comply with instructions of the Supervisor*."[12] In addition to those lists, the employee handbook also contained a "catch-all" provision, providing that:

> The illustrations of unacceptable conduct cited previously are to provide some examples of disciplinary action and to alert employees to the more commonplace types of employment violations that occur.

[10] Doc. no. 54 (ASRI Employee Handbook), ¶ 7.2 ("Potential Offenses Committed Subject to Disciplinary Action"), at ECF 6.

[11] *Id.*, ¶ 7.1, at ECF 6 ("ASRI adheres to a progressive disciplinary policy in dealing with its employees, however, there are some offenses that shall result in immediate termination."); *id.*, ¶ 7.3 ("Potential Offenses Committed Subject to Immediate Dismissal"), at ECF 6-7.

[12] *Id.* at ECF 6 (emphasis supplied).

> *However, because conditions of human nature are unpredictable, no attempt has been made to establish a complete list of examples. Should there arise an instance of unacceptable behavior not included in the above list, the Company may find it necessary to initiate* disciplinary action or *termination in accordance with the severity of the offense* [as] *determined by management.*

*Id.,* ¶ 7.5, at ECF 8 (emphasis and alteration supplied).

### B. Insider Threat Program

Due to the secrecy and sensitivity of work performed by ASRI's employees for the Army,[13] the company implemented an "Insider Threat Program." Some of the purposes of the program were described in the company's Security Handbook as

> prevent[ing] espionage, violent acts against the Nation[,] or the unauthorized disclosure of information; deter[ring] cleared employees from becoming insider threats; detect[ing] employees who pose a risk to information systems and protected information; and mitigat[ing] the risks to the security of information through administrative, investigative, or other responses.

Doc. no. 56 (2022 ASRI Security Handbook), at ECF 4 (alterations supplied). Employees were required to become, and to remain, familiar with the requirements of that program, and any other policies and procedures that pertained to "their job duties within the confines of the Federal installation or agency that they support." *Id.* at ECF 1.

---

[13] *See, e.g.*, doc. no. 56 (ASRI's 2022 Security Handbook), at ECF 3 (recording that ASRI had been granted "access to classified information at the TOP SECRET LEVEL" for the work performed in Building 4500).

Employees also were required to report any observed "Insider Threat Indicators." Examples included an employee who "*Works odd hours without authorization*."[14] The program applied to both classified and unclassified areas of the facility in which plaintiff worked.[15]

During the years that plaintiff was employed by ASRI, he acknowledged, in writing:

- his receipt, training, and comprehension of the contents of the "Insider Threat Program";
- that he had received annual security refreshers; and,
- that he had received copies of the company's employee handbook, code of business ethics and conduct, Security Handbook, list of the company's standard practices and procedures, and the company's code of professional conduct.

Doc. no. 53-2 (Plaintiff dep.), at 76, 80-82, 86, 88-90, 95-96, 98; *see also* doc. no. 56 (ASRI Security Handbook), at ECF 10-14.

## C. Plaintiff's Employment

Plaintiff performed mechanical design work in support of ASRI's subcontract with an entity identified in the record as "Engineering Research Corporation

---

[14] The example quoted in text was cut from the list of seven "threat indicators" printed in *id.*, at ECF 26-27.

[15] Doc. no. 53-2 (Plaintiff dep.), at 129-30.

('ERC')."[16] He originally was assigned to ASRI's Environmental Component Logistics department ("ECL").[17]

"A security clearance was required for" plaintiff's work.[18] Accordingly, he was issued a common access card ("CAC"), which is a smart, credit-card sized identification badge issued by the United States Department of Defense ("DoD"). Such devices are described as "smart" because they contain an embedded, integrated-circuit "chip" holding a built-in microprocessor and memory that stores personal identification information. It serves as the standard identification device for members of the active-duty military, civilian employees of DoD, and contractor personnel eligible to access Redstone Arsenal and its facilities.[19] The device permitted plaintiff to enter, exit, and navigate areas within Building 4500.

Plaintiff's core work hours were from 6:00 a.m. until 2:30 p.m (in military time, 0600 to 1430).[20] He was not permitted to work overtime, or to enter and remain inside Building 4500 outside his core work hours without prior authorization from a

---

[16] Doc. no. 53-1 (Quick decl.) ¶ 7 ("ASRI performed major sub-contracting responsibilities for Engineering Research Corporation ('ERC') currently operating as Astrion d/b/a ERC."), and ¶ 8 (plaintiff "was hired by ASRI to perform work that supported a contract ASRI had with ERC.").

[17] *Id.* ¶ 9.

[18] *Id.* ¶ 8.

[19] *See*, *e.g.*, https://en.wikipedia.org/wiki/Common_Access_Card (last visited Sept. 3, 2026).

[20] Doc. no. 53-2 (Plaintiff dep.), at 111.

supervisor.[21]

Five months after beginning his employment as a direct hire of ASRI,[22] plaintiff was observed by another employee outside Building 4500 at 4:30 a.m. on the morning of June 18, 2014.[23] That other employee reported plaintiff;[24] an investigation ensued; and CAC "swipe" records established that he had entered and departed Building 4500 outside his core work hours.[25] Plaintiff was disciplined by ASRI's site manager,[26] who warned him that he must leave the Building at 2:30 p.m., the end of his authorized workday, and that he was not permitted to return until his next tour of duty began at 6:00 a.m. on the following work day.[27] Later that same day, however, plaintiff was observed entering Building 4500 at 8:30 p.m.[28] The site manager ordered plaintiff to leave, and he complied.[29] Those infractions resulted in the

---

[21] *Id.* at 149.

[22] See note 1, *supra*.

[23] *Id.* at 199 (the other employee was identified in the incident report as "Brenda Lowe").

[24] When the headlights of Ms. Lowe's automobile illuminated plaintiff, he allegedly "dropped to the ground in a manner that made her think he was attempting to evade detection." *Id.*

[25] *Id.*

[26] The name of the site manager does not appear in the record.

[27] Doc. no. 53-2 (Plaintiff dep.), at 205.

[28] *See* doc. no. 63 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), ¶ 18 ("That same evening [June 18, 2014], Plaintiff requested permission from the site manager of the Environmental Component Analysis ('ECA') section to study 3D graphic/design technology that evening, but Plaintiff's request was explicitly denied"); and *id.*, ¶ 19 ("Despite that denial, the ECA site manager observed Plaintiff entering Building 4500 A West Gate at 8:30 p.m. and instructed Plaintiff to go home").

[29] Doc. no. 53-2 (Plaintiff dep.), at 203-04.

placement of electronic restrictions on plaintiff's CAC, so that the card only allowed him to enter, exit, and navigate within Building 4500 during his core work hours. Those electronic restrictions were later removed, but the record does not establish when or why they were taken away (possibly during a periodic card renewal process).[30]

## D. SolidWorks CAD Software

During 2018, plaintiff and other ASRI employees received training on a computer-aided design ("CAD") software program known as "SolidWorks."[31] Following that training, plaintiff submitted a "work order" to ASRI's "Help Desk," asking for the program to be installed on his computer.[32] The *software* apparently *was installed* on plaintiff's computer, but he was not able to *activate it*, because only a limited number of *licenses* were allocated by the software developer to ASRI's Environmental Component Logistics department, and all of the authorized licenses were in use by other ASRI employees.[33] Even so, plaintiff developed a subjective belief that an entry-level engineering technician named Ethan Burson had "taken" or "seized" the SolidWorks software license that, plaintiff believed, should have been

[30] Doc. no. 53-4 (Quick dep.), at 26-29.

[31] Doc. no. 53-2 (Plaintiff dep.), at 216; doc. no. 53-3 (Meagher dep.), at 17.

[32] Doc. no. 53-2 (Plaintiff dep.), at 244, 246.

[33] *Id.* at 245-47.

allocated to him.[34]

Plaintiff was transferred from ASRI's Environmental Component *Logistics* department to the company's Environmental Component *Analytics* ("ECA") department on May 23, 2020.[35] Following his transfer, plaintiff complained to the ECA program manager, Andy Meagher, about the allocation of one of the scarce SolidWorks licenses to a younger, less experienced employee (Ethan Burson), rather than to him.[36] During deposition, however, plaintiff testified that he did not think he "precisely" said that was an act of age discrimination.

> Q. Okay. Did you tell [Andy Meagher] you thought it was age discrimination that [the SolidWorks license] was given to Mr. Burson?

---

[34] *Compare id.* at 282 (where plaintiff testified that he complained to Andy Meagher in 2020 "that a younger employee had *taken* my *software*") (emphasis added)) *with* doc. no. 1 (Complaint), ¶ 68 ("Plaintiff complained to Andy Meager [*sic*] about his *license* being *seized and given to* a younger and less experienced employee who did not have an associate's degree" (alteration and emphasis supplied)), *id*. ¶ 76 ("Parker was retaliated against and terminated for complaining that due to his age (over 40) his SolidWorks *license* was fraudulently *taken* without his knowledge *and given to* a much younger employee in his twenties" (emphasis added)), and *id*. ¶ 88 ("Plaintiff complained to Andy Meager [*sic*] that his SolidWorks *license* had been *seized* and *given to* a younger employee under 40") (alteration and emphasis added)).

[35] Doc. no. 53-1 (Quick decl.), ¶ 9 (stating that plaintiff was transferred from ASRI's Environmental Component Logistics (ECL) department to the Environmental Component Analytics (ECA) department on May 23, 2020, "because the group that Plaintiff's work supported was actually located in the ECA department and the funding for Plaintiff's position was being issued to the ECA department"); doc. no. 53-3 (Meagher dep.), at 24 (the transfer occurred "Mostly because of funding"), 26-27 (same).

[36] *Compare* the statement in text *with* doc. no. 1 (Complaint), ¶ 6 (asserting that plaintiff's transfer from the ECL department to ECA "occurred shortly *after* he complained about the taking of his Solid Works license" (emphasis supplied)). Plaintiff could not have complained to Meagher *before* the transfer from his former department.

A. I may or may not have. I do know I told him that I was — I was kind of upset when I said it.

Q. Okay. You don't recall for sure if you said, [“]I think I have been discriminated against because of my age in that the software [license] was given to Ethan Burson[”]?

A. *I don't think I said that precisely*. I do believe I was mad that they gave it to a younger, unexperienced [*sic*] employee. I made that comment to him when I found [out that] Ethan Burson had it.

Doc. no. 53-2 (Plaintiff dep.), at 287 (alterations and emphasis supplied).

Notably, there is no evidence refuting Andy Meagher's testimony that plaintiff did not require the use of the SolidWorks software to perform his job duties in the Environmental Component Analytics department.[37] Moreover, the computer programs that plaintiff and other ASRI employees used to perform their work were controlled by the United States Army, not defendant.[38]

**E. Plaintiff's Last-Minute Declaration**

Plaintiff stated in a declaration submitted on the last day his opposition to defendant's motion for summary judgment was due to be filed that, during “the first

[37] Doc. no. 53-3 (Meagher dep.), at 17.

[38] Doc. no. 1 (Complaint), ¶¶ 34-37; doc. no. 53-2 (Plaintiff dep.), at 214 (lines 3-5: admitting that the government determined what programs plaintiff needed to perform his job); *id.* at 216 (reciting plaintiff's answers to interrogatories); doc. no. 53-3 (Meagher dep.), at 19 (testifying that the SolidWorks license did not belong to plaintiff, but to the Army: “It was not his license. It was the government's license.”).

week in early August 2022,"[39] he spoke with ASRI's Chief Administrative Officer, Sheila Quick, about several concerns: *e.g.*, his desire to return to the "design department,"[40] and be promoted to a "team lead" position; his failure to receive updated training in certain areas; and, *not being granted a license to activate the SolidWorks software*. Doc. no. 63-2 (Plaintiff decl.), ¶ 3. Plaintiff also declared that he told Ms. Quick about

> very specific information [he] had heard from a colleague that older, late middle aged employees like myself were being increasingly pushed out of ASRI in favor of younger, cheaper replacements who could absorb [the older employees'] workload, and that [he] feared some of the concerns [he] described were related to this trend.

*Id.* ¶ 4 (alterations supplied).[41] There is no evidence supporting the hearsay assertion that "older, late middle aged employees . . . were . . . pushed out of ASRI in favor of younger, cheaper replacements."

**F. Plaintiff's Presence in Building 4500 Outside Core Work Hours**

Redstone Arsenal's CAC "swipe" records established that plaintiff entered or

[39] The first week of August 2022 began on Monday, August 1, and ended on Friday, August 5, 2022.

[40] Although the record is not clear on the point, plaintiff apparently sought reassignment to the Environmental Component Logistics department in which he had initially been employed as a mechanical designer.

[41] Ms. Quick testified that she had no recollection of plaintiff telling her about rumors that the company was replacing older workers with younger employees; and she added that, if he had done so, she would have documented his statements, and would have initiated an investigation into an allegation of age-related discrimination. Doc. no. 53-4 (Quick dep.), at 57-59. No such documentation is contained in the record.

departed Building 4500 outside his core work hours at least ten occasions on six dates in 2022: *i.e.*, *July 1* at 4:57 a.m.; *August 8* at 4:38 a.m.; *August 9* at 3:49 a.m. and 4:24 a.m.; *August 12* at 4:48 a.m.; *August 19* at 4:51 a.m. and 5:19 a.m.; and, *August 23* at 4:43 a.m., 5:01 a.m., and 9:42 p.m.[42] Notably, all events, except for the first, occurred on dates *after* plaintiff's declaration states that he spoke to Sheila Quick about his age-related concerns. (As previously noted,[43] the first week of August in 2022 began on Monday, August 1, and ended on Friday, August 5, 2022.)

Another ASRI employee, Keith Cannon, raised questions about plaintiff being inside Building 4500 outside his core work hours with Jason Widner (Section Manager for Engineering Research Corporation) and Andy Meagher (Program Manager of ASRI's Environmental Component Analytics department). Cannon was asked to reduce his statements to writing, and he complied by sending an email to Widner and Meagher. The date of his email is not specified, but its text was read into the record during plaintiff's deposition, as follows:

> Requested statement per request below is my recollection of events that happened at Building 4500. Either Tuesday or Wednesday night, I really don't recall which night, the Climatics technicians asked who the guy is that they keep seeing around the building in the middle of the night.

---

[42] Doc. no. 53-2 (Plaintiff dep.), at 257-58.

[43] See note 39. *supra*.

> After the description of him, I told them it sounded like Steve Parker. I asked Jason if he was running a twenty-four-hour test or something and he said no. And then Jason asked me to see if his car was in the parking lot when I arrived the next morning at 01:30. When I arrived, a white Honda Civic was in the parking lot. It was backed in the spot, so I didn't see the license plate. I walked through Jason/Steve's area around 2:30 and Steve's door was shut, but I could hear what sounded like something working out or lifting something repeatedly. I never did see Steve in the building in person, so I cannot validate that it was him.

Doc. no. 53-2 (Plaintiff dep.), at 258-59.[44] Plaintiff confirmed during deposition that he drove a white Honda Civic.[45]

Meagher forwarded a copy of Cannon's email to ASRI's Chief Administrative Officer, Sheila Quick. She then compiled a summary of multiple incidents on which plaintiff had been inside Building 4500 outside his core work hours.[46] The summary was typed on a form entitled "Incident Response Reporting/Incident Identification Information," and noted the date and time of notification as "8/25/22 12:40 p.m." (a notation that presumably indicates the date and time on which a copy of Cannon's email was read by Ms. Quick). The report concerned "Employee onsite odd hours" at "RWESS Bldg 4500."[47] Quick indicated that "the type of incident detected" was

---

[44] The email itself is not contained in the record.

[45] Doc. no. 53-2 (Plaintiff dep.), at 259.

[46] Doc. no. 63-1 (Incident Response Reporting form); *see also* doc. no. 53-4 (Quick dep.), at 87-88.

[47] Doc. no. 63-1 (Incident Response Reporting form). **NOTE**: The internet indicates that, in the local context of Huntsville, Alabama, the acronym "RWESS" stands for "Redstone Wide Engineering and Support Services": a major defense and technical support contract operating out

that "Steven Parker, RWESS contract employee of ASRI was onsite at Redstone Arsenal outside of normal business hours." She further indicated that the "Incident Priority Level" was "high." The report contained the following additional information:

> Where did the incident occur?
>
> Building 4500 Redstone Arsenal, Alabama. All ASRI employees supporting work in this building are required to have a security clearance.
>
> Who reported or discovered the incident?
>
> Jason Widner, ERC ["Engineering Research Corporation"] RWESS Section Manager reported to the ASRI PM [Program Manager] Andy Meagher that Steven Parker was wondering [*sic*] around building 4500 after hours, a secure area.
>
> How was it discovered?
>
> Several RWESS contract employees were working a 24/7 test in building 4500 and saw Steven walking around in various locations of the building to include his personal work area and around the shower area in the building.
>
> Are there any other areas that have been compromised by the incident? If so, what are they and when were they discovered?
>
> While the cognizance falls within the confines of the government customer, we do not believe that [plaintiff] had any access to classified or controlled unclassified information.
>
> * * * *
>
> Have the source(s) of the incident been located? If so, where, when, and

---

of the Redstone Test Center, and providing testing, safety management, enterprise resource operations, and engineering services for military and government operations in Huntsville. See https://sam.gov/opp/2bcc8e01696265efef89ad05755375f7/view (last visited Aug. 20, 2026).

> what are they?
>
> Redstone security was notified immediately. 8/25/22 The PM [Project Manager] and Section Manager met with the employee who told them that he had been to the facility once to pick up something that he had left. The employee's CAC card was collected, and he was placed on Admin[istrative] Leave until we could determine what was happening. Based on information from Redstone security, we were able to determine that the employee had frequently been in the building after hours for several days. 8/29/2022 Corporate Management met with Mr. Parker to determine if/why he would tell us that he had been in the facility on multiple occasions after hours. *He was not honest in his response*. 8/30/2022 Mr. Parker was terminated from ASRI employment. A security incident was reported in DISS [*i.e.*, the "government security system where security clearances are tracked"[48]].

Doc. no. 63-1 (August 25, 2022 Incident Response Reporting Form) (alterations and emphasis supplied).

Quick also provided the following information in the "Evaluation" section of the form:

> How well did the Incident Response Team (IRT) respond?
>
> All pertinent personnel were notified during this incident and the proper meetings and investigations conducted. Since this was an event onsite at RSA, we did not involve our Corporate Investigations team other than HR/Security, and President.
>
> * * * *
>
> What additional resources are needed to detect, analyze and mitigate future incidents?
>
> *Since this employee had been told on another occasion that he should only work during core business hours unless approved by his*

[48] Doc. no. 53-4 (Quick dep.), at 90.

> *supervisor,*[49] his CAC card should have had core business hours only. This is out of our control as we do [*sic*: not] have CAC approval and designation privileges. *His prior access had been reduced to core business hours but at the time of CAC renewal, the limited hours were likely removed from his CAC.*

*Id.* (emphasis, footnote, and alteration supplied).

Andy Meagher, Program Manager of ASRI's Environmental Component Analytics department, conducted the meeting referenced in Quick's report, which occurred on Thursday, August 25, 2022. The other participants present were plaintiff and Jason Widner, Engineering Research Corporation's Section Manager.[50] Following the meeting, Meagher prepared the following summary:

> The following is a recollection from Andy Meagher of the conversation that occurred during the [August 25, 2022] meeting.
>
> At approximately 1225, Jason Widner contacted Stephen [*sic*] Parker by phone and asked him to come to Jason's office. Mr. Parker arrived at approximately 1240. I asked Mr. Parker to be seated and then asked Mr. Parker what his duty hours were. Mr. Parker replied that his duty hours were 0600-1430 [6:00 a.m to 2:30 p.m.], Monday through Friday. I stated to Mr. Parker that it had come to my attention that he had recently entered building 4500 in the early hours of the morning. Mr. Parker replied that he had stopped to pick up something he left in his office. Mr. Parker said he dropped by after visiting the gym on Redstone Arsenal. I asked Mr. Parker if that was his story and if he was stick [*sic*] to it. Mr. Parker replied yes. Mr. Parker started to state that he was unable to sleep at times and would come out to RSA to work out at the gym. Then Mr. Parker started to talk about nose bleeds and other health

[49] This obviously is a reference to the incidents that occurred on June 18, 2014, which were discussed *supra*, in Part I.C. of this opinion.

[50] Doc. no. 63-4 (Memorandum documenting August 25, 2022 meeting).

> issues before I interrupted him. I repeated Mr. Parker's duty hours and stated to Mr. Parker that he was not to enter before 0600 and leave by 1430 Monday-Friday. Mr. Parker stated that he was late to work today and asked if he could stay until 1700. I replied no as did Mr. Widner. Mr. Widner told Mr. Parker that he was working to limit his Mr. Parker's CAC access to 4500 and was trying to get that in process completed today [*sic*]. I told Mr. Parker that there would be a follow up meeting at ASRI Corp the following week. End of discussion.

Doc. no. 63-4 (alterations supplied). Plaintiff's CAC card apparently was revoked later that same day.[51]

## G. Plaintiff's Termination

Sheila Quick and ASRI's President, William Colson, met with plaintiff four days later, on Monday, August 29, 2022.[52] Quick testified during deposition that plaintiff initially denied having entered or exited Building 4500 outside his core work hours, but later admitted that he had been inside the building *on just one occasion*, for the purpose of retrieving a document.[53] When plaintiff was confronted with information that he had entered or exited Building 4500 outside his core work hours on numerous occasions during August 2022,[54] "[h]e just said he didn't do it."[55] Following the meeting, Colson made the decision to terminate plaintiff's

[51] Doc. no. 53-4 (Quick dep.), at 100-01.

[52] *Id.* at 101.

[53] *Id.* at 102.

[54] See the list in the text accompanying note 42, *supra*.

[55] Doc. no. 53-4 (Quick dep.), at 102.

employment, and verbally communicated his decision to Quick.[56]

Plaintiff's employment was formally terminated on Tuesday, August 30, 2022. The relevant parts of the termination letter, signed by ASRI's President, William Colson, read as follows:

> Thank you for your support on the RWESS Contract at Redstone Test Center, Redstone Arsenal, Alabama.
>
> It is with regret that I advise that your employment with ASRI will end immediately *as you were in a secure government facility outside of core business hours on multiple occasions*. Additionally, you are in violation of your supervisor's instruction of reporting to work only during the hours of 6:00 a.m. to 2:30 p.m. Monday through Friday. *You had previously been advised and counseled in 2014, based on similar actions, that you should not be in the secure government facilities after normal duty hours without explicit supervisor authorization*.
>
> In this most recent reported occurrence, after being approached about being in the facility outside of normal work hours you were dishonest in your response. You stated that you were only in the facility on one specific occasion after hours. We believe based on other personnel statements and automated ID card access logs that you have been in the facility on multiple occasions after normal working hours.
>
> You also stated that you are aware of the 2-person rule, that anyone in the facility after core business hours requires 2 people [to] be present, yet you willingly [*sic*] violated this on multiple occasions.
>
> The above instances present both security and safety violations as well as a deliberate disregard for following procedures.

Doc. no. 56 (Aug. 30, 2022 Letter from William A. Colson to Steven Parker)

---

[56] *Id.* at 113-14.

(emphasis and alterations supplied).[57]

Following his termination, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.[58] The EEOC issued a notice of right to sue on December 14, 2023,[59] and this lawsuit ensued.

## II. DISCUSSION

The Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*., makes it unlawful for an employer to retaliate against an employee because the employee engaged in protected activity by, among other things, opposing an unlawful, age-based, employment practice. *Id*. § 623(d). To state such a claim, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). A plaintiff who asserts a retaliation claim must establish that, "but for" his statutorily-protected statements, he would not have suffered an adverse employment action. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).

[57] Plaintiff testified in deposition that, when he met with Sheila Quick to sign the termination letter, he told her that "Jason Widner had created a hostile work environment and that [he] believed it was due to age." Doc. no. 53-2 (Plaintiff dep.), at 288 (alteration supplied). Quick denied that such a statement was made during plaintiff's exit interview. Doc. no. 53-4 (Quick dep.), at 145.

[58] Doc. no. 1-1 (Charge of Discrimination).

[59] Doc. no. 1-2 (Determination and Notice of Rights).

## A. Protected Activity

Paragraph 88 of plaintiff's complaint states that he complained to Andy Meagher, the program manager of AI Signal Research's Environmental Component Analytics department, "that his SolidWorks license had been seized and given to a younger employee under [the age of] 40."[60] Paragraph 89 adds that: "In 2020 and in August 2022, Parker complained that younger employees were treated more favorably than employees over 40."[61] Plaintiff's June 1, 2026 declaration added a gloss to both allegations, as well as his deposition testimony about them. The relevant portions read as follows:

> 2. I write to address several aspects of my deposition testimony on October 3, 2025. When I was deposed previously, the experience was a very stressful one for me and I experienced a high level of nervousness and anxiety. I also was very focused on answering and clarifying only the specific questions in front of me. I was frankly uncertain when I needed to volunteer information and assumed that I would be able to add information when my previous lawyer's turn came to ask me questions.
>
> 3. I inadvertently left out that [during] the first week in early August 2022, I spoke with Sheila Quick, whom I understood to be the head of ASRI human resources. I raised several concerns about problems I was having. *I discussed with her* my desire to return to the design department and to obtain a promotion to a team lead role; concerns that I had not received updated training in certain areas; and *the continuing issues with the deactivation of my SolidWorks license*.

[60] Doc. no. 1 (Complaint), ¶ 88.

[61] *Id.* ¶ 89; *see also id.* ¶ 71 ("In early August of 2022, Parker complained that younger and less experienced workers were being treated more favorably than older workers.").

> 4. *I also brought up very specific information I had heard from a colleague that older, late middle aged employees like myself were being increasingly pushed out of ASRI in favor of younger, cheaper replacements who could absorb our workload, and that I feared some of the concerns I described were related to this trend.*
>
> 5. Ms. Quick told me that I needed to address my issues with Andy Meagher, whom I understood to be the onsite ASRI program manager. I do not know why the company did not treat my concerns as an age discrimination complaint, consistent with its HR policies.

Doc. no. 63-2 (Plaintiff decl.), ¶¶ 2-5 (alteration and emphasis supplied).

ASRI argues that plaintiff's account of a meeting with Quick during the first week of August, 2022 is "a wholesale fabrication of a new event that Plaintiff failed to mention when squarely asked under oath," rather than a clarification of his deposition testimony.[62] ASRI points out that, during his deposition, plaintiff identified only two complaints of age discrimination: the first, to Andy Meagher in 2020, when addressing the allocation of a SolidWorks software license to a younger employee; and the second, to Sheila Quick, during his August 30, 2022 exit interview, following his termination.[63] There was no mention by plaintiff during his deposition of a meeting with Quick in the first week of August 2022.

### 1. Eleventh Circuit standards for evaluating "sham" allegations

The Eleventh Circuit standard for evaluating alleged "sham affidavits" was

[62] Doc. no. 65 (Defendant ASRI's Reply to Plaintiff's Response to Defendant's Revised Motion for Summary Judgment), at 5.

[63] See doc. no. 53-2 (Plaintiff dep.), at 281-82; see also note 57, *supra*.

explained in *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986), where the Court held that:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).
>
> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. *An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . .* [and that party attempts] *thereafter* [to] *create such an issue with an affidavit that merely contradicts*, *without explanation*, *previously given clear testimony*." *Van T. Junkins* [*& Associates v. United States Industries, Inc.*, 736 F.2d 656,] at 657 [(11th Cir. 1984) (emphasis supplied)].

*Tippens*, 805 F.2d at 953-54.

The Eleventh Circuit burnished the *Tippens* standard in *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987), when saying that

> our cases require a court to find *some inherent inconsistency* between an affidavit and a deposition before disregarding the affidavit. *If no inherent inconsistency exists*, the general rule allowing an affidavit to create a genuine issue "even if it conflicts with earlier testimony in the party's deposition," *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980), governs. In these instances, any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact. [Emphasis supplied.]

*Rollins*, 833 F.2d at 1530. In summary, the Eleventh Circuit doctrine on "sham affidavits" rarely results in the exclusion of evidence. *See id.* (stating that the rule should be applied "sparingly because of the harsh effect [it] may have on a party's case") (alteration supplied).

**2. Plaintiff's explanation**

Plaintiff explained his failure to identify during deposition his meeting with Quick during the first week of August 2022 as an occasion on which he complained about age discrimination by saying that: his deposition was a very stressful experience; he was unsure whether he was permitted to volunteer information beyond the question posed; and, he believed that he would be able to supplement his answers when questioned by his prior-attorney, Blake Edwards. However, a review of the deposition transcript does not necessarily support those explanations. Plaintiff readily volunteered information beyond the question posed. Nevertheless, it is not for this court to resolve whether his explanations are credible.

Plaintiff's declaration does differ from his deposition testimony, but it is not "inherently inconsistent." Defendant's attorney did not directly ask plaintiff whether he had identified *all* of his age discrimination complaints; and, she did not ask about the allegation in paragraph 89 of plaintiff's complaint that, "in August 2022, Parker complained that younger employees were treated more favorably than employees over 40."[64] Accordingly, the court concludes that plaintiff's declaration should not be disregarded as a "sham," because it does not *directly contradict* his earlier deposition testimony.

Even so, the issue of whether plaintiff's assertions were protected activity is a closer question.

**(a) *Older employees were being "pushed out"***

Plaintiff must have possessed a good faith, *reasonable belief* that his employer was engaged in unlawful employment practices: *that is*, his assertion that "older, late middle aged employees . . . were being increasingly pushed out of ASRI in favor of younger, cheaper replacements who could absorb our workload" was based on objective facts, as opposed to hearsay statements by another employee.[65] *See Harper v. Blockbuster Enterprises Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998). It is not

---

[64] Doc. no. 1 (Complaint), ¶ 89; *see also id.* ¶ 71 ("In early August of 2022, Parker complained that younger and less experienced workers were being treated more favorably than older workers.").

[65] Doc. no. 63-2 (Plaintiff decl.), ¶ 4.

sufficient for plaintiff to simply allege that "very specific information [he] had heard from a colleague"[66] was "honest and bona fide; the allegations *and record* must also indicate that the belief, though perhaps mistaken, *was objectively reasonable*." *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997). This record is devoid of facts that objectively support plaintiff's assertion.

**(b) *Plaintiff's assertion that* "his" *SolidWorks license had been* "seized" *and given to a younger employee***

Plaintiff also asserts his subjective belief that one of the licenses which permitted some ASRI employees to operate the SolidWorks CAD software program should have been assigned to him, and not to a younger, less experienced employee. However, Andy Meagher testified that plaintiff did not require the use of the program to perform his job duties. There is no contrary evidence in the record. Therefore, even if plaintiff's subjective belief is accepted, it is not clear that his inability to utilize the software program could be considered an unlawful employment practice, especially when one considers that it was the Army, and not defendant, which determined the programs that plaintiff was allowed for the performance of his job duties.[67]

---

[66] *Id*. (alteration supplied).

[67] *See* doc. no. 53-2 (Plaintiff dep.), at 214 (lines 3-5: admitting that the government determined what programs plaintiff needed to perform his job); *id*. at 216 (reciting plaintiff's similar answers to interrogatories); doc. no. 53-3 (Meagher dep.), at 19 (testifying that the SolidWorks license did not belong to plaintiff, but to the Army: "It was not his license. It was the government's

Plaintiff's attorney also said during oral argument that some of Mr. Parker's job duties were assigned to a younger employee, but that assertion is not included in his complaint or declaration. Moreover, counsel did not explain how reassignment of job duties was an unlawful employment practice.

**B. Causation**

Even if the questions about plaintiff's assertions of "protected activities"[68] are laid aside, plaintiff still must show a causal linkage between those statutorily-protected statements and the termination of his employment. In particular, he must show that ASRI's "desire to retaliate was the but-for cause" of his termination. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013).[69] Plaintiff argues that the close temporal proximity between his protected statements in the first week of August 2022 and his termination on August 30th supplies that link.

The Eleventh Circuit has recognized that, as a general rule, temporal proximity

---

license.").

[68] Doc. no. 1 (Complaint), ¶¶ 87-90.

[69] After observing that Title VII's anti-retaliation provision (42 U.S.C. § 2000e-3(a)) "appears in a different section from its status-based discrimination ban," *and*, that the statute "makes it unlawful for an employer to take adverse employment action against an employee 'because' of certain criteria," *and*, given "the lack of any meaningful textual difference between" § 2000e–3(a) and § 623(a)(1) of the Age Discrimination in Employment Act, the Supreme Court concluded that "the proper conclusion is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 352 (2013).

between a plaintiff's protected conduct and a subsequent adverse employment action is sufficient circumstantial evidence to raise an inference of causation. *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Even so, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id*.

Neither plaintiff nor defendant addressed the identity of the decisionmaker, or the decisionmaker's awareness of plaintiff's protected activity, in their briefs. As discussed previously, plaintiff's declaration reflects that he spoke to Sheila Quick in early August of 2022 about issues that may have implicated age discrimination. Quick testified in deposition that she did not recall the conversation, but that if it occurred, she would have taken the following actions:

> A. Elevated it for an investigation if he — if that indeed happened.
>
> Q. Do you believe you likely would have documented it?
>
> A. If it happened, yes.
>
> Q. And by document, I mean make some written memorialization that an employee, Steven Parker, came to me and claimed these things?
>
> A. Correct.
>
> Q. And you're supposed to document it; is that right?

A. Yes.

* * * *

Q. If I'm an employee at AI Signal, do I have to use the word or the term that I want to file a complaint about discrimination for the company to investigate my concern?

A. No.

Q. If I describe things that amount to discrimination, as HR business manager, did you have an obligation to investigate those things?

A. To — yes, and to elevate to where an investigation could be conducted.

Doc. no. 53-4 (Quick dep.), at 58-59 (ellipsis supplied). However, Quick did not identify a specific person to whom she would have elevated the subject matter of her conversation with Parker. Further, there is no evidence in the record that she did so, or that she otherwise documented her conversation with plaintiff.

The evidence is unrebutted that ASRI's President, William Colson, made the decision to terminate plaintiff's employment, following a meeting that included Quick, Colson, and ASRI's Chief Executive Officer, Anthony Jones.[70] There is no evidence, however, that Colson was aware of plaintiff's early August complaints of age discrimination. During oral argument, plaintiff's counsel suggested that, despite Quick's deposition testimony that she did not recall the conversation with plaintiff,

[70] Doc. no. 53-4 (Quick dep.), at 113-17.

her usual practice was to inform Colson of allegations of discrimination. But, Quick's deposition testimony does not support counsel's suggestion.

Notwithstanding, the Eleventh Circuit has rejected such an inferential leap, stating that:

> As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker *actually knew* about the employee's protected expression. That awareness, like most issues of fact, can be established through circumstantial evidence — *but not by unsupported inference*.

*Martin v. Financial Asset Management Systems, Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020) (emphasis supplied). Further, "[e]vidence that the HR manager 'could have told' is not the same thing as evidence that she 'did tell.'" *Id.* at 1054.

**1. A break in the causal chain**

In addition, ASRI argues that its discovery of plaintiff's misconduct after he engaged in protected activity negates any inference created by the temporal proximity between his protected activity and termination. The Eleventh Circuit has held that, even where close temporal proximity would otherwise create an inference of causation, "the intervening discovery of employee misconduct can sever the causal inference." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023); *see also Fletcher v. JM Smucker Co.*, No. 24-10392, 2025 WL 471123, at * 2 (11th Cir. Feb. 12, 2025) (same).

In this case, an ASRI employee reported to Jason Widner (Section Manager for Engineering Research Corporation) and Andy Meagher (Program Manager of ASRI's Environmental Component Analytics department), that an individual matching plaintiff's description had been observed by contract workers inside Building 4500 during "the middle of the night."[71] Redstone Arsenal security records established that plaintiff had entered or departed Building 4500 outside his core work hours on at least ten occasions between July 1 and August 23, 2022.[72]

Meagher and Widner met with plaintiff on August 25, 2022, and were not satisfied with his explanation for his presence in Building 4500 outside his core work hours.[73] Sheila Quick and William Colson met with plaintiff on August 29th, and Colson made the decision to terminate plaintiff's employment.

Plaintiff's employment was terminated on August 30, 2022, because of his presence "in a secure government facility outside of core hours on multiple occasions," *and* also because he violated his supervisor's instruction to report to work only during his core work hours — *i.e.*, he had been counseled and advised previously that he was not authorized to be present in the secure facility after normal

---

[71] Doc. no. 53-2 (Plaintiff dep.), at 258-59.

[72] *Id.* at 257-58.

[73] Doc. no. 63-4 (Aug. 25, 2022 email message from Meagher to Quick).

duty hours.[74] ASRI's employee handbook specifically identifies an employee's failure to comply with a supervisor's instructions as grounds for immediate dismissal.[75]

During oral argument, plaintiff's attorney emphasized that the employee handbook does not list an employee's presence in the top secret facility at odd hours as misconduct that is subject to disciplinary action. While that statement is accurate, the handbook provides a non-exclusive list of offenses, as well as a catch-all provision for unenumerated misconduct. Additionally, the insider threat program guidance identifies such behavior as cause for suspicion that should be reported.

All of the foregoing facts show ASRI discovered plaintiff's misconduct following his protected activity. Accordingly, any inference of causation raised by the close temporal proximity between his protected activity and termination is severed, and he has failed to establish a *prima facie* case of retaliation.

### C. Convincing Mosaic

That does not end the inquiry, however. The Eleventh Circuit has explained that, when a plaintiff cannot establish all of the elements of a *prima facie* case,

> the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions,

---

[74] Doc. no. 63-3 (Aug. 30, 2022 termination letter).

[75] Doc. no. 54 (ASRI Employee Handbook), at ECF 6.

> to demonstrate a material issue of triable fact. A court, therefore, should advance directly to *the convincing mosaic inquiry*.

*Ismael v. Roundtree*, 161 F.4th 752, 765 (11th Cir. 2025) (emphasis supplied).

In this case, plaintiff points to the following as circumstantial evidence that he would not have been fired had he not made age-related complaints in early August 2022: plaintiff did not receive formal disciplinary action when he committed the same offense in 2014; less severe remedies were available to ASRI in order to address plaintiff's after-hours presence in Building 4500 in 2022; and, there is a credibility dispute as to whether plaintiff was insubordinate and dishonest.[76] However, none of that circumstantial evidence permits a reasonable inference that William Colson actually was aware of plaintiff's protected activity and acted because of it. Plaintiff's failure to produce evidence of that fact is fatal to his retaliation claim.

## III. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment will be granted. A final judgment consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 8th day of September, 2026.

Senior United States District Judge

[76] Doc. no. 63 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 24-25.